# Exhibit 1

FEATURE

# How ICE Picks Its Targets in the Surveillance Age

After two officers came to a Pacific Northwest community, longtime residents began to disappear — a testament to the agency's quiet embrace of big data.

**By McKenzie Funk**

Published Oct. 2, 2019    Updated June 7, 2021

T he winter after Donald Trump was elected president, strangers began appearing in a parking lot on southern Washington State's Long Beach Peninsula, at the port where the oyster boats come and go. Rather than gaze at the bay or the boats or the building-size piles of bleached shells, two men — one thinner, one thicker — stared at the shellfish workers. The strangers sat in their vehicle and watched the workers arrive in their trucks. They watched the workers grab their gear and walk to the docks. The workers watched them watching, too, and they soon began to realize that the men were from Immigration and Customs Enforcement. When the workers made eye contact, the officers nodded politely, but they said very little. For weeks, they just watched. Then the workers began to vanish.

The officers got someone at a restaurant in the town of Long Beach. They got someone else in a predawn takedown at the port. They arrested a man early one morning in nearby Ocean Park and spent the rest of that day looking for another in the town of Chinook. Then, another day, they went back to the port for another morning arrest.

The men from ICE made courtesy phone calls to the local authorities at the Pacific County Sheriff's Office before making arrests, and local A.C.L.U. volunteers later obtained recordings of the calls, so it is possible to reconstruct the officers' growing familiarity with the peninsula and its residents. "Yes, ma'am," the thinner one said,

in a call recorded that January. "My name is Officer Lonnie Miller with Immigration and Customs Enforcement. We're going to be conducting an arrest out in the Nahcotta boat basin area this morning."

The sheriff's dispatcher sounded confused. "In where?" she asked.

"Nik-oda? Nik-otta? Near Ocean Park," Officer Miller said, trying different pronunciations. The site was named after an 1800s Chinook leader who had been friendly with the white settlers. "Nuh-caught-uh," the dispatcher said, gently correcting him.

The officer continued to struggle in February. "The Nikoda … Nicotta tidelands area," he said in one call. "The Nikoda boat basin … Nahcotta. I'm probably pronouncing it incorrectly."

But as spring turned to summer, Miller was learning to talk like a local — "I don't have a specific address, but it's the Port of Peninsula, um, up in Nahcotta" — and he and his partner, a deportation officer named M. Curtis Dietz, were turning their attention to the inland neighborhoods of the peninsula, where the workers lived with their families.

Miller and Dietz could drive from the port to Ocean Park, a village of 1,600 people, in about five minutes. Much of the drive took them along Bay Avenue, a broad thoroughfare that cuts across the two-mile-wide peninsula, connecting the shallow, oyster-rich waters of Willapa Bay on the east side to the thundering surf of the Pacific Ocean on the west side. Small businesses flank the avenue: a hardware store, a bank, a taco stand, a grocery store called Okie's, a restaurant catering to the retirees who have settled here in beach cabins and Cape Cod-style homes. Eventually the officers began spending more time around 1925 Bay Avenue, an apartment complex and trailer park known as Tijuanita. They lurked in a revolving fleet of unmarked vehicles — a blue Hyundai S.U.V., a gold Ford Taurus X, a muscle car residents remember as a Ford Mustang — outfitted with aftermarket flashing light bars. Twice in April and twice more in June, Miller called the sheriff's dispatcher to say they were parked just outside the trailer park, conducting surveillance.

The officers were looking for people, and seemingly for specific people. For the peninsula's Spanish-speaking families, this fact led to some urgent questions. How were the officers picking their targets? And how did they find them? To arrest someone, ICE had to know who was who, and who was undocumented, and who lived where, and who drove what — but how could its officers know all this?

As families waited for answers, they hid more often in their homes, drawing the blinds, skipping volleyball games and birthday parties. But life went on. In early June from the safety of one of the Tijuanita apartments, a woman named Gladys Díaz Tadeo, the mother of three young daughters, posted a photo on Facebook of her family's latest art project, a smiling piñata in the shape of a cupcake, which her proud 4-year-old struggled to hold up for the camera. Comments came pouring in.

"Que bonitas," wrote one neighbor. "Do you make them yourself?"

Díaz's sister Maria answered for her, "Yes, she makes them 🙂 she made me this," and shared images of other piñatas Díaz made, including a perfect rendition of the Dalmatian puppy from the cartoon "Paw Patrol."

The cupcake was for sale — $20 — but there was no immediate buyer, and Díaz's post, visible only to the roughly 10,000 other members of Chinookville, a private buy/sell Facebook group for the region, soon moved down the feed.

It is very likely that Díaz was already a target when she posted the piñata, very likely that ICE already knew her full name and address and license-plate number and social-media handles, had mapped out her family members' names, their social-media handles. When not in the field, Miller, Dietz and their colleagues spent long days at their computers at the ICE office in Portland, Ore., two hours from the peninsula, gathering intelligence and building target lists, some for daily operations, some for nationwide raids like those Trump repeatedly advertised last summer. Because Díaz had been caught a decade earlier trying to enter the country with a fake green card — she successfully slipped in the next day — she would have been marked as a priority for deportation.

On June 23, Miller and Dietz woke before dawn, as they frequently did, and began driving north up the peninsula, possibly from the tourist town of Long Beach, where they often overnighted at the Best Western. The air was still that morning, and the spring rains had finally stopped, and by the time the officers pulled off the road near Tijuanita, the sun was coming up. They began watching cars go by. One of the first to pass, a white pickup on its way to the port, was driven by Díaz's longtime boyfriend and the American-born girls' father, Baltazar Aburto Gutierrez, who is better known as Rosas. He recognized the officers and waved to them out the window — an act of quiet defiance. They waved back, Rosas says.

For most of the next few hours, according to the sheriff's dispatch records, Miller and Dietz kept sitting there. At 9:57 a.m., Miller called in to say they were clearing out. As apparently happened in April and again earlier in June, they were leaving empty-handed. But then, 18 minutes later, he called back. "Sorry to keep bothering you guys," he said, chuckling apologetically.

"That's O.K.," the dispatcher replied.

"We're headed back up to Ocean Park," he said. "We think our person is going to be heading over to the Bank of the Pacific."

When Rosas returned home, a little after 10 a.m., he found Díaz loading the piñata — and their daughters — into her car. Someone on Facebook had just responded to her ad. It was a person using a Hispanic name who didn't seem to speak much Spanish, someone she'd never met whose profile picture was of a dog. (When she tried to find the page again a few weeks later, it was gone.)

She was meeting the person next to Okie's at Bank of the Pacific.

"Why don't they just come here?" Rosas asked her. "Gladys, wait, don't go," he yelled after her as she drove off, but maybe she didn't hear him.

Miller and Dietz were waiting when Díaz pulled up to the bank. "Are you Gladys Díaz?" one asked. They showed her a printout they had somehow obtained of her Washington State driver's license. Her girls began to cry. "I don't want them to take

How ICE Picks Its Targets in the Surveillance Age - The New York Times

you!" the oldest screamed. Díaz tried to calm her. "You don't need to get upset," she whispered. "It's nothing. Let's see what happens."

Some peninsula residents arrested by ICE got to pay a bond — $10,000, $15,000, maybe $20,000 — and were released back into the community as they waited months or years for their day in immigration court. But Díaz, with a previous deportation on her record, would not be one of them. The officers handcuffed her, and 24 hours later, Díaz was in a private detention center near Seattle. Three weeks later, she was deported to Mexico, where she began bouncing among relatives' homes in her native Jalisco, separated by 2,600 miles from her daughters.

Case 2:26-cv-11432-BRM-CI  ECF No. 1-2, PageID.19  Filed 04/30/26  Page 7 of 39



Baltazar Aburto Gutierrez, known as Rosas, with his daughters Leah and Jaquelinne at their home in Ocean Park, Wash.  Matt Black/Magnum, for The New York Times

## 2. 'Felons, not families'

The business of deportation, like so much else in the modern world, has been transformed by the power of big data. There are 10.5 million undocumented immigrants living in the United States, according to the Pew Research Center, but there are only about 6,100 officers in ICE's Enforcement and Removal Operations (E.R.O.) division. (The roughly equivalent number of special agents in ICE's other main division, Homeland Security Investigations, or H.S.I., have historically focused on transnational crime rather than immigration violations per se, though this is changing.) There are 50 states for ICE to cover, as well as Washington and U.S. territories like Puerto Rico, more than 3.8 million square miles. There are continuing staffing shortages at the agency, where job satisfaction, while on the rise under Trump, remains notably low. And there is relentless pressure from the White House to deport people. So ICE tries to find efficiencies where it can, and it uses technology — some of it built for consumers, some of it built for spies or the police — to do more with less.

A spokeswoman for the agency said it would not comment on its investigative techniques, and the agency has declined to respond to many questions for this article. But public records make clear that ICE, like other federal agencies, sucks up terabytes of information from hundreds of disparate computer systems, from state and local governments, from private data brokers and from social networks. It piggybacks on software and sharing agreements originally meant for criminal and counterterrorism investigators, fusing little bits of stray information together into dossiers. The work is regulated by only a set of outdated privacy laws and the limits of the technology.

*[What happens after an ICE raid? Read more about the deportation process.]*

Tracking immigrants in this country is an increasingly trivial exercise because it's an increasingly trivial exercise to track any of us. The same phenomenon helped make the reporting for this article possible: Over the course of more than a year, I tried to reverse-engineer individual ICE officers' use of America's vast post-Sept. 11 domestic-surveillance apparatus, retracing their hunt for targets down to the very searches they entered into their computers. Based on hundreds of government-procurement records, dozens of interviews and thousands of pages of documents I

and others obtained via public-records requests, the account that follows reveals new evidence of surveillance of detainees' voice and video calls at ICE facilities and extensive proof that the agency relies on state D.M.V. databases and information products like CLEAR, from Thomson Reuters, to target immigrants. It shows how the Real ID Act of 2005, along with funding from the Department of Homeland Security (D.H.S.) and help from umbrella groups like the American Association of Motor Vehicle Administrators (A.A.M.V.A.), has laid the groundwork for real-time, real-world monitoring of American residents. It's still a partial view. But it's enough to show the scale of the machine.

ICE's transformation began under President Barack Obama. Criticized by activists as the "deporter in chief," Obama indeed removed more than three million people from the country, including, in 2013, what remains the annual record — 432,448 people. But part of the spike he oversaw was an accounting trick: Near the Southern border, migrants caught trying to cross were increasingly subject to formal removal proceedings (and thus officially counted in statistics), a change from previous administrations.

Away from the border, Obama tried to shift ICE's priorities. He curtailed the agency's longstanding practice of workplace raids, and active pursuit was now largely limited, especially during his second term, to convicted criminals, suspected gang members or terrorists and people apprehended at the border. The administration also discouraged so-called collateral arrests, in which ICE came looking for one person and instead nabbed a neighbor or a co-worker. The lowest priority were long-term residents with American children or spouses. "Felons, not families," Obama explained in a 2014 speech. "Criminals, not children. Gang members, not a mom who is working hard to provide for her kids."

ICE now needed systems that could more intelligently parse priority targets from the general population of millions of undocumented immigrants. Under Obama, the agency signed several key data and analytics contracts that have since drawn controversy, including with Thomson Reuters, the Silicon Valley firm Palantir and the Beltway start-up Giant Oak, and it relied ever more on local-federal data-

sharing initiatives that flourished after Sept. 11. Information that was once siloed or tedious to access — driver's-license photos, phone records, jail bookings — was increasingly at deportation officers' fingertips.

One of Trump's first acts as president was to throw out his predecessor's priority list. He issued Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," on his sixth day in office. "We cannot faithfully execute the immigration laws of the United States," the order reads, "if we exempt classes or categories of removable aliens from potential enforcement." Data once used to focus on prioritized groups could now, in theory, be used against anyone, and individual officers now had a freer hand to pursue their own priorities. The results were predictable: Both the percentage and sheer number of arrests by ICE of people without criminal convictions shot upward. There were 58,010 such arrests during the administration's first 14 months, according to an analysis by NBC News — nearly three times as many as during the preceding 14 months. Statistics compiled by Syracuse University's Transactional Records Access Clearinghouse, meanwhile, show a significant rise in immigration cases involving long-term residents.

In an interview before her retirement this year, Elizabeth Godfrey, ICE's acting field office director for the Pacific Northwest region, pointed to another reason the profile of its arrestees had changed: A series of pre-Trump court decisions, notably one made by a federal judge in Oregon in 2014, led a growing number of jails across the country to stop honoring ICE requests that they notify the agency of pending releases or hold immigrants beyond their scheduled release dates. This, together with sanctuary policies in a growing number of jurisdictions, cut off deportation officers' easiest source of arrests, driving them to new hunting grounds.

Officers working out of Godfrey's Portland office — which was shut down for more than a week by protests last year — still carefully prioritized their targets, she said. They studied them in advance. Before attempting an arrest, they completed a form, the Field Operations Worksheet, and had it approved by two layers of supervisors. When given a choice, they would always pursue someone with a serious criminal history rather than someone without. But that wasn't always the

Case 2:26-cv-11432-BRM-CI ECF No. 1-2, PageID.23 Filed 04/30/26 Page 11 of 39

choice. Targeting decisions also depend on who's findable. And today who's findable depends on who has left a trail for officers to follow: people with driver's licenses, people with car insurance, people with utility bills, people who pay U.S. taxes, people with social-media accounts, people with stable homes, people with American-born children, people who live American lives, people who once thought — if only for a moment — that they weren't on the list.

"We still have a job to do," Godfrey told me. "We still have a mandate. So where are we going to locate these people? At a place of employment or at their home or anywhere else we can find them."



Shellfish beds near the Port of Peninsula, Nahcotta, Wash. Over time, ICE officers began arresting many of the industry's workers. Matt Black/Magnum, for The New York Times

### 3. 'They knew who I was.'

The first person outside Pacific County's Mexican community to notice the ICE crackdown was Erin Glenn, a soft-spoken high school teacher whose family has lived and farmed in the area for five generations. In 2015, after years of little noticeable ICE activity, a man she'd known for decades was suddenly picked up and deported. At first Glenn, who studied Spanish in college and later taught English to recent immigrants, let doubts creep in. "It's the feds," she says. "I thought they must know something about him I didn't." But the next year, as Trump campaigned and soon won the presidency on promises to clamp down on immigration, ICE arrested at least eight more of Glenn's neighbors and friends, and she saw a trend. She began to privately tally the names of the people who had disappeared. The arrests seemed to accelerate, and the list became more detailed: how people were taken, where they were taken, when they were taken and whom they left behind.

In March 2017, Glenn attended a community meeting to tell her fellow residents about the disappearances in their midst. "I have the names," she declared. "I created a spreadsheet. It's real." The group — a few dozen people organizing under the banners of Living Liberally and A.C.L.U. People Power, most of them white and female, many of them retirees — decided to do something about it. They raised money to help pay legal fees for the newly detained and buy food and pay rent for the families left behind, eventually forming their own nonprofit, Pacific County Immigrant Support.

According to Glenn's tally, Gladys Díaz was ICE's 22nd local arrest. She was the second woman. She was the first mother of young children. In the tense days that followed, Glenn made a phone call to an old friend, Sydney Stevens. Stevens lives up the peninsula in Oysterville, a tiny village founded in part by her great-grandfather, in a stately 1869 house overlooking Willapa Bay. A teacher for 41 years, she is a local historian and the author of 19 books on the area's settlers, tribes, farms and railroad. She writes a popular blog and has a column in the

regional newspaper, The Chinook Observer. She has a platform, and Glenn, who in normal times tends toward privacy, desperately wanted a platform. "You need to do something," she told Stevens.

Over lunch the next day, Glenn and Stevens developed a plan: Glenn would make introductions and serve as translator as Stevens wrote a series of profiles for The Chinook Observer of the people taken and the families who remained.

Their first visit was to Gladys Díaz's sister Maria, who in Stevens's description was slight and young, "all eyes," and was holding her 2-year-old son when she opened the door. Three months had passed since her husband, Miguel, was arrested, and now ICE had Gladys too. Maria was preparing paperwork and selling off their possessions so she and their children, who were U.S. citizens, could join Miguel in Mexico. She worried ICE would arrest her before they could depart on their own. "I am afraid every day," she told Stevens. She met the ICE officers who arrested him, she said. It was Miguel's payday, and they took him home before driving him to detention so he could deliver his family a last paycheck. They were polite, she said. She told Glenn and Stevens a variation of what they would hear time and again in their interviews: "They knew who I was."

How ICE knew what it knew remained a subject of great debate on the peninsula. Washington is one of 14 states that allow undocumented people to obtain driver's licenses, and some Pacific County residents suspected that an employee at the Department of Licensing (D.O.L.) office in the town of Ilwaco, a man who always asked lots of questions when immigrants came in, was the mole. (A D.O.L. spokeswoman said that such behavior would be a violation of departmental policies and that the agency had no evidence of it occurring.) Others suspected that ICE received help from the sheriff's office or the Long Beach police, contrary to the spirit of Washington State's sanctuary policy. The People Power activists filed public-records requests, but the files that came back, including the sheriff's emails and audio of Officer Miller's courtesy calls to dispatch, suggested that local authorities were largely in the dark.

The continuing mystery left everyone spooked. One activist told me about a police car parked near her house after she filed a records request. A woman whose family members were undocumented said she heard clicking sounds on her cellphone, and she was careful about what she said in case the calls were being monitored.

Glenn's son has a Hispanic first name — his father was born in Mexico — and now she sometimes caught herself wondering if she should have named him something else. One rainy night, the two of them were driving home after dark in her weathered S.U.V., and the headlights behind her seemed to follow her every turn. She pulled on to a side street, and the car behind her did, too, and she returned to the main road, and it did, too, so she and her son went instead to her parents' place, where she parked in the driveway with her heart pounding. They stayed the night.

The creeping paranoia sometimes seemed ridiculous to her, and sometimes it didn't — because people kept vanishing. "One moment they're living life," Glenn told me, "and then they're gone, their car just sitting on the side of the road. It feels like a death."

The third of the 14 profiles Stevens wrote for The Chinook Observer, a series called "Stories from the Heart" that would go on to help the paper win statewide journalism honors, featured Rosas and his girls waiting at home while Díaz sat in the detention center. The ICE officers had walked the family back to the apartment to return the girls to Rosas. "Why don't you just take all of us?" he recalled saying to them, when we later spoke. "Why don't you take me and leave Gladys? Why did you do this in front of my girls?" He remembered one of the officers — Miller and Dietz are both known to show detainees small acts of kindness, like loosening handcuffs that aren't actually that tight — saying he was sorry. "I'm sorrier," Rosas said.

Neither deportation officer would speak with me when I called their cellphones — Dietz did stay on the line long enough to ask how I had his private number, which I obtained from a data broker — but Dietz detailed the encounter with Rosas in a written report. The subject "appeared visibly nervous," he wrote. "It was clear that his native language is Spanish." He noted that Rosas had asked to be taken instead,

indicating that Rosas, too, was undocumented. But "ICE deportation officers did not arrest him at that time due to humanitarian reasons," an agency spokeswoman explained in a statement, "so he could care for family members."

In a December 2017 internal email recently obtained by the rights groups Detention Watch Network and Mijente, Matthew Albence, then the head of E.R.O. and now ICE's newest acting director, gave a blunter version of the same explanation. His agency had just been contacted by the office of Gov. Jay Inslee of Washington, who wanted to discuss the case of Díaz and Rosas. "The mother was a fugitive and was being arrested," Albence wrote to members of his staff. "We could've arrested the man at the time and left the children as wards of the state — I don't think that's a practice the governor would like us to start."



ICE officers in Oregon traveling in an unmarked vehicle to make an arrest before dawn.   Matt Black/Magnum, for The New York Times

## 4. 'Hot lists'

The first evidence that ICE's data harvesting relied on something other than a rogue Department of Licensing employee was an explosive Seattle Times article in early 2018. Brad Benfield, an assistant director at D.O.L., confirmed to the reporter Nina Shapiro that when deportation officers emailed the department's fraud unit to inquire about a target, the unit gave them whatever it had: photos and even, crucially, driver's-license application forms — which included key details like place of birth and whether, for instance, a Mexican passport had been used to prove identity. In hundreds of partly redacted emails I acquired from the department, including its correspondence with Officers Miller and Dietz, fraud-unit employees seem harried as they field dozens of queries a day from a variety of federal and state agencies. "Here is your request," one writes over and over. "Here is your request." "Here is your request." "Here is your request."

Inslee effectively made Washington a sanctuary state in February 2017 in response to Trump's Executive Order 13768. But now, a year later, one of his own agencies was revealed to be feeding information to ICE. The Seattle Times article caused a local uproar. One top D.O.L. official immediately resigned, and the department's longtime director soon followed.

But the emails to and from the fraud unit, my reporting shows, were just the beginning: ICE also had a direct line to D.O.L.'s main database. Using a computer interface known as Driver and Plate Search, or DAPS, Miller, Dietz and dozens of other immigration officers ran tens of thousands of searches before D.O.L., facing pressure from rights groups, journalists and the governor's office, cut off their access last year.

The department opened up DAPS to outside users after Sept. 11 to replace the human team it had kept on call 24 hours a day, seven days a week, to field queries from the police and federal agencies. Now investigators could log in and run their own searches. The system's modern interface and flexible search — for partial

plate numbers, for street addresses without an exact house number, for phonetic matches to a name — appears to have made it a favorite over older systems such as Nlets, originally known as the National Law Enforcement Teletype System, a network shared by 45,000 agencies in the United States and Canada. By the time people started disappearing from the Long Beach Peninsula, F.B.I. officers had accounts, and federal marshals had accounts, and local sheriffs had accounts, and ICE officers used it again and again, nearly every day at all times of day.

According to search logs I obtained through public-records requests, deportation officers covering Pacific County and the rest of western Washington ran at least 102,769 queries through the system in 2016 and 2017, most of them after Trump took office, including 9,747 in the first two months of his presidency: 5,415 for names and 4,332 for plates. One unidentified ICE employee even logged in at 2:34 a.m. on New Year's Day 2017, spending the next hour running searches on six plates and 11 names.

Officers Miller and Dietz, whose beat also includes parts of Oregon — which DAPS doesn't cover — used the system regularly in 2017. Together they searched it 4,542 times. They searched it 67 times in the 24 hours before Gladys Díaz was arrested. Roughly half of their searches in 2017 were for names, not plates, implying that they already knew whom they were looking for and simply needed an address or other information. But many days, perhaps the days the officers sat at the side of the road and watched traffic pass, perhaps the days they cruised parking lots outside restaurants or seafood processors or apartment buildings, perhaps the days they saw drivers they decided looked foreign, the searches followed the telltale pattern of a fishing expedition: plate, plate, plate, plate, plate, plate, plate, plate.

Under Trump, the fishing has only become easier. In December 2017, as first reported by the technology website The Verge, ICE gained long-sought access to the world's largest privately run database of license-plate scans — more than five billion historic images captured continually and automatically, thousands per minute, by infrared devices attached to lampposts and police cars and repossession-agent vehicles across the United States. Plates are scannable

because D.M.V.s now design them that way: In a 2012 A.A.M.V.A. best-practices guide partly funded by ICE's sister agency within D.H.S., Customs and Border Protection (C.B.P.), A.A.M.V.A. advises its members to use opaque inks and "retro-reflective" surfaces and to always keep letters and numbers away from any bolt holes that could confound the machines.

The database ICE uses is run by Vigilant Solutions, a California company recently acquired by Motorola that has agreements with more than a thousand law-enforcement agencies nationwide. ICE's roughly $200,000-a-month contract — a previous version was batted down over privacy concerns during the Obama administration — lets deportation officers map immigrants' daily rhythms with true granularity. Now they can see precisely when and where vehicles of interest have been spotted during the previous five years, and they can upload 2,500-plate "hot lists" that trigger immediate iPhone alerts whenever a target is scanned by a camera in the network.

As computer vision improves, ICE has become interested in another D.M.V. data trove: digital images of our faces. Washington, like nearly all states, is now using facial-recognition software to find duplicate driver's licenses and root out identity fraud — a technological leap made possible by D.H.S. funding, A.A.M.V.A. guidelines and a provision in 2005's controversial Real ID Act that requires license photos to be digital and thus easily stored and shared. Internal D.O.L. records, reported here for the first time, show that until January 2018, the department repeatedly fed the resulting instances of what it determined by an investigation to be fraud to ICE and other federal agencies — including one partly redacted file, titled Facial Recognition Spreadsheet III, that may contain the name of someone in Pacific County. In early July 2019, as first reported by The Washington Post, Georgetown University's Center on Privacy & Technology released documents revealing that at least two more states (Utah and Vermont) have run face searches against their driver's-license databases on behalf of ICE. There are surely others: A.A.M.V.A. offered facial-recognition guidelines to its members — every D.M.V. in

the country — in 2015. "One of the benefits of using a facial image as the biometric," it argued, "is that unlike a fingerprint, acquisition of the biometric image is unobtrusive." Surveillance works best when you don't notice it.

In Pacific County, Erin Glenn and Sydney Stevens worried that they had revealed Rosas' identity to ICE by printing his first name and nickname in The Chinook Observer. But Rosas had registered and insured his white truck under his own name, following the law, and he had a legal Washington driver's license. By the time Stevens published the interview, Miller and Dietz had run the truck's plate through DAPS at least seven times.



ICE officers making an arrest in Oregon.  Matt Black/Magnum, for The New York Times

## 5. 'A veneer of objectivity'

If the recurring fear in Pacific County was that some unknown person — the sheriff, a local informant — was secretly behind ICE's arrests, the recurring fear among rights groups in the other Washington, in the District of Columbia, was quite the opposite: that immigration decisions would soon be so automated as to effectively cut humans out of the loop. Exhibit A as the new administration took control of the capital was the Extreme Vetting Initiative.

The initiative was ICE's attempt to bring an ill-defined Trump campaign promise to life using artificial intelligence. The agency introduced it in a July 2017 "industry day" in a Marriott conference room near Ronald Reagan Washington National Airport, inviting a flock of technology firms and Beltway contractors. The event's host was the Counterterrorism and Criminal Exploitation Unit (C.T.C.E.U.), an office within H.S.I. that scrutinizes visa applicants and visa holders before and after they arrive in the United States. The guests, according to a sign-in sheet obtained by The Intercept, were a parade of billion-dollar companies — Thomson Reuters, LexisNexis, IBM, Booz Allen Hamilton, Deloitte, PricewaterhouseCoopers — along with various smaller newcomers, including the social-media monitoring start-ups Giant Oak and Babel Street. To build the system it wanted, ICE expected to award one or some of them a contract worth $100 million or more. Interest was so high that the Marriott event, originally planned for one day, had to stretch to two.

The goal of the Extreme Vetting Initiative was "determinations via automation," ICE explained to the attendees. It sought partners whose algorithms could scan social media and other publicly available information and assess whether an immigrant was likely to become a "positively contributing member of society" — or whether he or she intended "to commit criminal or terrorist attacks." Written text would be analyzed for sentiment, Facebook posts for aberrant thoughts, emojis for signs of criminality. The system would replace C.T.C.E.U.'s human analysts and "generate a minimum of 10,000 investigative leads annually."

In early 2018, ICE seemed to retreat from the Extreme Vetting Initiative, which has since been renamed the Visa Lifecycle Vetting Initiative. The contract, for $102 million, went to CSRA, a Beltway giant already doing work for ICE that has since

been purchased by General Dynamics. The company employed more than 100 human analysts — ensuring that people would still be firmly in charge of vetting other people. But the retreat, procurement documents show, was partial at best: H.S.I. had already been testing automated social-media profiling under Obama, and many of the technology companies that showed up at ICE's Marriott event were already working for it.

In 2016, ICE paid a broadband provider $50,400 "to strengthen C.T.C.E.U.'s open-source social-media exploitation capabilities as well as future growth by adding fiber-optic internet." For the social-media capabilities themselves, it paid $1.4 million that year — and has since paid millions more — to Giant Oak, a rapidly expanding, 30-person analytics firm in Virginia that was founded by the behavioral economist and former C.B.P. chief of staff Gary Shiffman. One of Giant Oak's early contracts was for a DARPA "quantitative counterinsurgency" project in Afghanistan. Two years ago, Forbes reported on the company's work with ICE and detailed its flagship product, GOST, short for Giant Oak Search Technology, which allows users to search the dark web and social media to create "a dossier on each individual with everything you need to know, such as web page images and keywords already highlighted."

When I met Shiffman in a pub in Georgetown last year, he confirmed that the company worked for H.S.I., vetting visa holders and visa applicants, but not for E.R.O. Its technology wasn't in the hands of domestic deportation officers like Miller and Dietz. He made clear that he didn't want to live in a country that indiscriminately rounded up foreigners. But if public safety was the goal, the answer wasn't to stop scanning people's data. It was to do it the right way. "Now this is my theory," he told me, "and you tell me if it's crazy or wrong. But I think that the better we have entity resolution" — that is, the better we can compile and measure people's data — "the less of a surveillance state we'll have." Once the machine is perfect, as long as you're following the rules, you won't even have to know it's there.



Mario Rodríguez, who has applied for asylum, in his bedroom. ''I always wanted to come here,'' he says. ''It was my American dream.''  Matt Black/Magnum, for The New York Times

## 6. 'So we ended up arresting him.'

A week after ICE's Extreme Vetting Initiative event, computers delivered what could be considered a new kind of collateral arrest to Pacific County. Mario Rodríguez, a bilingual teaching aide in the local schools, matched none of the agency's stated enforcement priorities, even under Trump. He appeared on ICE's radar earlier that summer, Miller wrote in his arrest report. The two deportation officers had been "conducting an investigation into a separate individual at his apartment complex," and they used DAPS to run the plates of the vehicles parked in the lot. Three, including a black Jeep, were registered to Rodríguez. Armed with his name, the officers then made a "biographic search of immigration and criminal

history databases," which showed that Rodríguez entered the United States legally on a visa in 2005. A visa overstay is a civil offense, and Rodríguez has no criminal record. But here he was, bird in hand, man in database, so soon after, Miller wrote, "a Field Operations Worksheet was completed," adding him to their list of targets.

Rodríguez is watchful and deliberate and seems younger than his 51 years. A generation of Pacific County students knows him as Maestro Mario, and at the time of his arrest, he was about to return to university to receive his teaching degree, so he could finally have his own classroom. In his former career in Mexico, where he earned a degree in information science, Rodríguez worked various security and public-safety jobs. He had a U.S. visa because he once went on a business trip to Silicon Valley to visit Cisco Systems. He liked what he saw. "I always wanted to come here," Rodríguez told me. "It was my American dream."

Rodríguez is gay. In Mexico, he says, he could not be. During high school, he changed his voice to sound "more like a man" and avoid bullying, and in 2000, fearing he would lose his job if he remained suspiciously single, he married a woman. In 2003, he found out he had H.I.V. — he'd contracted the disease before his marriage — and during a clinic visit, the doctor outed Rodríguez to his wife and declared that he was paying the consequences. To be gay and H.I.V.-positive in Mexico, and dependent on doctors like that for his medication, was untenable, Rodríguez soon decided. So he got on a plane to the United States and cleared customs without incident, and when he arrived on the Long Beach Peninsula, where his brother already lived, he felt welcome.

It was a Thursday morning a dozen years later, sometime after 10 a.m., when Rodríguez passed Miller and Dietz in Long Beach on his way to the post office. They recognized his car — "You always keep it so clean!" he says they later told him — and began to follow him. At 10:32, DAPS logs show, Dietz ran his plate again, perhaps just to make sure. When Rodríguez pulled into the post-office parking lot, the two officers did, too. As Rodríguez walked inside, Miller called out his name: "Mario." Rodríguez smiled and shook the stranger's hand, and Miller

Case 2:26-cv-11432-BRM-CI   ECF No. 1-2, PageID.37   Filed 04/30/26   Page 25 of 39

showed him his badge. The officers were friendly enough, Rodríguez says. They let him get his meds from the back seat, where he'd been keeping a month's supply in case of emergency, such as if ICE came for him.

Before they drove him to Portland in handcuffs, periodically making sure he liked the radio station they'd chosen, Miller called the Pacific County Sheriff's Office.

"How's it going this morning?" he asked the dispatcher.

"It's a-goin'," she responded. "How's it going with you?"

"Good. So, we were driving through Long Beach, and we, um, saw one of our suspects that we were investigating." He chuckled a bit. "So we ended up arresting him," he continued. "We usually try to call you guys ahead of time, but it was just one of those things where …"

The dispatcher started laughing. "He just showed up?" she asked.

"Pretty much," Miller said, and now they laughed together for a moment, sharing in the serendipity of it all.

At the ICE field office in Portland, the officers put Rodríguez in a cold room and served him lunch, a burrito.

"Who's going to come get your car from the post office?" he says Miller asked him.

"My brother."

"Oh, yeah, what's his name? Where's he work?"

Rodríguez began to respond until he realized that this, like so many other interactions that had once seemed normal, was an exercise in data-gathering. "Do I have to answer that?" he asked.

For at least four hours, the officers questioned him, most likely entering his answers into a computer application, ENFORCE, that helps feed a data pool of more than 100 million records called the Enforcement Integrated Database. An actuarial tool in the database, the Risk Classification Assessment, uses details

gleaned from a detainee's life — criminal and health history, address, work and family stability, lack of scars or tattoos or previous deportations — to automatically calculate supervision requirements or how much bond he or she should be asked to pay, a decision that would be reviewed by an E.R.O. officer and sometimes an immigration judge. Under Obama, the tool sometimes recommended immediate release for certain people, but under Trump, according to a 2018 Reuters investigation, that option was removed. (An ICE spokesman told Reuters that ICE personnel could still override the tool's assessment.)

When the paperwork was finally done, Rodríguez says, a "rude woman" took over, shuttling him and another detainee, a Guatemalan, into a short white bus with hard plastic seats and bars on its windows. Instead of handcuffs, they had to wear what is known as a three-piece suit: shackles on wrists and ankles, a metal band around the waist and chains connecting them all. Rodríguez says the woman wore a uniform of the Geo Group, a $2 billion publicly traded prison operator whose stock price nearly doubled in the three months after Trump's election. She drove them three hours north to a 1,575-bed ICE facility then known as the Northwest Detention Center, in a remedied Superfund sludge field in Tacoma, Wash., where Rodríguez would spend most of the next month. He was released, pending an appearance in immigration court, after posting $7,500 at his bond hearing. It was one of the lowest bonds anyone from Pacific County had paid to that point — but it was his savings for the school he was about to attend, and it was almost everything he had.



ICE officers searching an immigrant at a facility in Portland, Ore.   Matt Black/Magnum, for The New York Times

## 7. 'Who is this?'

The dehumanizing nature of America's immigrant detention centers is now well documented. At ICE's Geo-run facility in Tacoma — where Díaz and most of Pacific County's other arrestees also ended up — there have been hunger strikes to protest the conditions, and at least one lawsuit is pending over underpayment: Detainees working the usual array of prison-style jobs earn $1 a day.

Less well documented is how the ICE detention centers are now engineered to subject immigrants to further surveillance. According to promotional materials for one of the companies that provides technology to ICE facilities, these capabilities

include software that can not only record and catalog both sides of a conversation but also analyze links between the callers and the recipients.

Video and audio calling in ICE facilities is formally provided by an Alabama company called Talton, which holds the federal contract. But the calls run on technology from the San Francisco company Telmate, which licenses to Talton the same platform it sells to hundreds of jails and prisons in America's criminal-justice system. Telmate is a subsidiary of GTL, a technology firm that American Securities, a private-equity company, picked up for about $1 billion in 2011. It follows a recognizable version of the Silicon Valley business model: Its users — inmates, detainees and their families and friends — get convenience in the form of calls, video chats, voice mail messages, photo sharing and text messaging, while its real clients — prisons and law enforcement — get user data.

Telmate's privacy policy tells inmates and their friends and family members to "assume that all communications will be accessed, reviewed, analyzed, searched, scrutinized, rendered searchable, compiled, assembled, accumulated, stored, used and transferred." Its web-based surveillance software, which it promotes as free to guards and investigators with every install, includes call-pattern analysis, relationship analysis and tools for data visualization.

A spokesman for Telmate said: "We defer to Talton and its customer as to how they configure the licensed technology." ICE would not comment on its monitoring of detainees' calls or its officers' use, if any, of Telmate's free investigative tools. It likewise declined to comment about any cellphone forensics it may or may not perform, though the agency has options if it wants to scan an immigrant's phone: As Forbes reported, H.S.I. has paid millions of dollars to two leading phone-hacking companies, Cellebrite and GrayShift. And if it needs to tap a phone line, it may be able to do so: It also has a contract with PenLink, which makes call-interception tools.

In Pacific County, many people suspected ICE was interested in their phones. One resident told me she had noticed something unusual when her husband was behind bars in Tacoma, his phone confiscated: He periodically showed up as logged in to

Facebook.

The oddest story came from Mario Rodríguez: One evening a few days after his release, Rodríguez missed a call from a fellow detainee who was still inside and needed a favor. To help the young man, Rodríguez had to get his alien number, or a-number — a tracking code D.H.S. assigns to noncitizens. Knowing that the young man's girlfriend, who was named Evelyn, regularly checked his Facebook account for him, Rodríguez sent a message to the account: "necesito el número de A."

The message was time-stamped 7:10 p.m. At 7:11 p.m., Rodríguez's iPhone buzzed not with a Facebook message but a text:

"Who is this," the person wrote in English.

"This is Mario," Rodríguez answered, explaining that he was the detainee's friend from Tacoma.

"This is Justin," the stranger replied. "I'm from Longview" — a town just outside Pacific County. The stranger's number indeed had a local area code and Longview prefix.

"I apologize," Rodríguez wrote. "I thought this was a response from a text message I sent from Facebook."

"And I thought this was a chick named Evelyn who might be able to help me obtain something," wrote "Justin."

Rodríguez wondered how the stranger knew Evelyn's name and how he had his phone number, and suddenly he was scared again, fearing he would become the collateral in another digitized sting. "I'm sorry," he wrote. "I don't know her. Bye."

Justin's number isn't linked to any person on Spokeo or Nexis, or to anyone on Facebook, or even to any name in the constantly updating files of some of the commercial data brokers ICE itself uses — which is unusual if he truly exists.

Case 2:26-cv-11432-BRM-CI   ECF No. 1-2, PageID.42   Filed 04/30/26   Page 30 of 39

Later calls and texts to the number would receive no response. There was just a generic recording, in English and Spanish: "The person you're trying to reach is not accepting calls at this time." But at least Justin, like many of the strangers lately haunting Pacific County, was polite. "Its all good," he messaged Rodríguez, "she sold cheap cell phones bye."



A cell at an ICE facility in Portland, Ore. Matt Black/Magnum, for The New York Times

## 8. 'Mission critical'

Amid the sea of acronyms in Officer Miller and Dietz's arrest reports from Pacific County — CLAIMS, CIS, IDENT, NCIC, TECS — one database name sticks out: CLEAR, short for Consolidated Lead Evaluation and Reporting. While the other databases the officers list are in some ways unsurprising — they're mostly federal government systems that run, sometimes ploddingly, on mostly federal government data — CLEAR, a sleek commercial product of Thomson Reuters, is different.

CLEAR is powered by personal information: data from credit agencies, cellphone registries, social-media posts, property records, utility accounts, fishing licenses, internet chat rooms and bankruptcy filings, all fused and vetted by algorithm to form an ever-evolving, 360-degree view of U.S. residents' lives. The Wall Street Journal once memorably dubbed such commercial data brokers "Big Brother-in-Law." While public attention has lately focused on the Silicon Valley spy contractor Palantir — which in September was in the process of renewing a three-year, almost $50 million contract with H.S.I. — investigative products like CLEAR have received relatively little scrutiny. But E.R.O. has called Thomson Reuters's services "mission critical."

A key benefit of CLEAR, even after Trump's 2017 executive order exempted most foreign visitors and immigrants from the Privacy Act, is that it isn't restricted by protections on what data the government can collect or keep — because it isn't government-owned. It has real-time access to address and name-change data from credit reports and to motor-vehicle registrations in 43 U.S. states plus the District of Columbia and Puerto Rico. Its utility records, which come from more than 80 electric, gas, water, telephone, cable and satellite television companies nationwide, are updated daily, making it hard for immigrant families — or anyone else — to move into a new home without detection. Incarceration and arrest records, often paired with booking photos that allow for facial-recognition-powered virtual lineups, arrive almost immediately from 2,100 state and local agencies.

Some of the jail and arrest data comes from Thomson Reuters's agreement with a company called Appriss Safety, which runs the database JusticeXchange (now known as Justice Intelligence); the database includes, in spite of Inslee's sanctuary

order, bookings from all over Washington State. A second CLEAR agreement is with Vigilant Solutions, which, according to a 2017 news release, allows Thomson Reuters to integrate its license-plate data into CLEAR. In fact, ICE's contract isn't directly with Vigilant. The agency's subscription fees — averaging more than $2 million a year — go to the Thomson Reuters subsidiary West Publishing. Some data from CLEAR can also be found in another system ICE has used, the privately run law-enforcement network CopLink, which connects the I.T. systems of more than 700 public-safety agencies on a single platform. (Many of these companies have declined to confirm the details of their operations.)

As described by Reveal, a publication put out by the Center for Investigative Reporting, Thomson Reuters's services for ICE also include a custom job the agency has described as "a continuous monitoring and alert system to track 500,000 identities per month." It notifies E.R.O.'s Targeting Operation Division with every change "in the target's identifiers." Thomson Reuters's government work — which its chief financial officer highlighted in an August 2018 earnings call — has been a strong driver of growth. Including options, its standing contracts with ICE are now worth at least $30 million.

At the other end of the data chain, at Washington's D.O.L., officials who curtailed ICE's access to DAPS soon had to grapple with how much information might still be leaking to the agency via commercial brokers. First reported here is that in 2017, D.O.L. earned $26,371,232 selling driver and vehicle records to 19 principal data brokers, including Experian, LexisNexis and R.L. Polk — a group of companies that had its own relationships with some 34,500 "subrecipient" brokers, including TransUnion, Acxiom and Thomson Reuters. "One of the things that we realized is that we're not just a public-safety agency," D.O.L.'s Brad Benfield told a State Legislature committee in May 2018. "We're very much a data-sharing agency."

In March 2018, D.O.L. sent a team including two auditors to the Detroit offices of R.L. Polk, which it had identified as a data supplier to Thomson Reuters. The auditors determined that no Washington driver or vehicle records had ended up

with CLEAR or ICE via this route, Benfield told me — but they found evidence that there was indeed a potential route. "We are working with Polk on what we call a corrective action plan," he said.



María de Lourdes García Ornelas at home with her children, Angel Avila García and Vanessa Avila García, after their father, José Avila, was deported. Matt Black/Magnum, for The New York Times

## 9. 'Continuous monitoring'

Look up a Pacific County resident in the files of a data broker, and you'll find that the more stable the life, the more the person tries to play by the rules, the easier he or she is to find. Even the arrest of a grandfather and 19-year U.S. resident named José Avila, whose disappearance was the next to shock the region after Díaz's and Rodríguez's, takes on a kind of machine logic if you see the available data. When I

ran Avila's name through a LexisNexis public-records product, I easily found up-to-date targeting information like the name of his mobile-home park. There were also email addresses: one from an account at EverydayFamily.com — you give the website your data in exchange for free samples of baby products — and one from when he or one of his sons hunted for budget medical schools at ValueMD.com. For almost two decades, Avila's wife told me, she and her husband made a show of good faith by filing federal taxes. They used an ITIN, or Individual Taxpayer Identification Number, in lieu of a Social Security number. This, too, made them trackable: One of ICE's requirements for Thomson in its "continuous monitoring" system for the agency was that it "return information and addresses" from ITIN data.

Miller and Dietz got Avila early one Wednesday in August. "We're probably going to be doing a vehicle stop," Miller told the sheriff's dispatcher, "but the individual doesn't leave until a little closer to 6:00." Avila swung out of the driveway in his pickup right on time, and they stopped him. As Sydney Stevens wrote in The Chinook Observer, they let him call one of his sons before confiscating his phone, and when the young man arrived, Avila was gone. His coffee was still warm, and his breakfast, wrapped in a paper towel upon which his youngest son had scrawled "DAD," was uneaten.

I looked up Rosas in the same LexisNexis database. He has a thinner file. Though Officer Miller would later claim to have received a "public tip" calling Rosas a regular drug user — a charge that Rosas and people who know him strongly deny — he has no criminal record of any kind. His address on Bay Avenue is in the file because of a 2014 small-claims case against him for $1,823 in unpaid medical expenses. He had cut his hand on a bucket at work, he told me, and assumed that the emergency room bill had been paid through his employer's workers' compensation plan. Eventually, Rosas himself had to pay, and he also paid with his data when his address, taken from court records, made it into the machine.

That fall, the Seattle Times reporter Nina Shapiro, the same one to later reveal D.O.L.'s emails with ICE, came to Pacific County to write about the crackdown. For the agency, her article would be an unwelcome spotlight on its practices here — but

also a new data point as it monitored a new target: Rosas. Unnamed in the article but quoted extensively and identified as Díaz's boyfriend, he told Shapiro his family's separation story, mentioning that his daughters were then in Mexico visiting their mother. To the deportation officers, this seems to have become a "tip indicating that the subject's children had departed the United States," as Dietz later wrote. And if Rosas was no longer caring for dependents, he was no longer protected from deportation.

ICE, later sued by activist groups in federal court for violating vocal immigrants' First Amendment rights, including Rosas', would deny wanting to punish him for talking to the press. "But, I mean, we do read the papers," Elizabeth Godfrey told me, "so we knew his family situation had changed."

At 12:31 p.m. on Oct. 2, 2017, high tide in Willapa Bay, just as the skies above the Long Beach Peninsula dried out and the wind began to blow, Officer Miller entered Rosas' license plate into DAPS. Perhaps they had passed each other on the highway again. Perhaps they had just met again at Okie's. Perhaps it was just Rosas' time. The next day, at 11:52 a.m., Miller emailed the D.O.L. fraud office to request details about a person of interest. The man's name is redacted in the documents I obtained, but he was born in Guerrero, Mexico, as Rosas was, and he first received a Washington driver's license in the town of Union Gap, as Rosas did. He originally used a Mexican birth certificate and voter registration to prove his identity — as Miller and Dietz would later determine Rosas had done. "Please send me a copy of his first known application," Miller wrote. "This subject is under federal investigation." D.O.L. sent him the documents 12 minutes later. A month passed, and Shapiro's article about Pacific County appeared in The Seattle Times. Seven days later, on Nov. 16, the deportation officers filled out a Field Operations Worksheet — and Rosas went from person of interest to approved target.

After Thanksgiving, on the morning of Nov. 27, the deportation officers woke up early and climbed into their blue Hyundai S.U.V. At 4:58 a.m., Miller called the Pacific County dispatcher: "Ah, yes, ma'am," he said, "I'm just calling to let you guys know that we're going to be conducting surveillance and attempting to make an arrest in your area." At first they sat at the side of Highway 101 near Chinook

with their headlights on, lying in wait for a different target. Then they moved 20 miles north to Okie's, parking in the same lot with Bank of the Pacific where they grabbed Díaz five months before. It was known "that the subject would generally come to the store between 0730 and 0800 each morning," Dietz explained in his report.

At 7:50, Rosas turned into the parking lot, and the deportation officers saw him, and he saw them. They sped toward him in the Hyundai. "Emergency lights were activated in the government vehicle, and the subject was directed to park his vehicle," Dietz wrote. He didn't resist. They double-checked Rosas' driver's license, which he says that they confiscated and later destroyed, and cuffed him and sat him in the back seat.

Miller called the dispatcher again. "I'm just calling to let you guys know that we have one male in custody," he said.

## 10. 'I'm on the boat, and I've got to keep going.'

The story would seem to end there, but it didn't. It still hasn't. Rosas would bond out of detention after six weeks, would welcome his daughters home to Ocean Park from Mexico in the spring of 2018 — the youngest was still shuddering whenever she saw a person in a uniform — and would attend a preliminary immigration hearing in Seattle that August. And then he would wait. Like other peninsula residents out on bond, like Mario Rodríguez — who is still on the peninsula and still fighting for asylum based on his sexual orientation and H.I.V. status — Rosas would be caught in the growing case backlog under Trump. His next hearing is in May 2021.

The elementary schools are different now on the peninsula, the classrooms whiter, some of the students and staff gone. The oyster farms need workers. The hotels are hiring. ICE officers still periodically appear. Residents still disappear. The activists' list of the detained or deported now has more than a hundred names, and when Pacific County Immigrant Support held a fund-raiser this summer, 130 people packed the room, together contributing $14,500 to what has become an entrenched fight. The event featured a taco bar, a local band called the Oyster Crackers and a

video call-in from a local resident who was being held inside the former Northwest Detention Center in Tacoma, which was recently renamed the Northwest ICE Processing Center. The man made the call using Telmate. The activists gave him a standing ovation. It's possible that as they stood there, a machine recorded and archived the sounds of their clapping hands.

While ICE's data operations move forward, Washington's D.O.L. has now spent two years trying to go in reverse. Deportation officers can't access its databases anymore, not without a court order, and their daily email correspondence with the fraud office is over. "We've made many changes," Christine Anthony, a spokeswoman for D.O.L., said.

What may be most unusual about Washington State is not what it collects and not what it has shared but the degree to which it has been forced to become transparent about the vast quantity of personal data that courses through its bureaucracy. For decades, the overriding objective of American business and government has been to remove friction from the tracking system, by linking networks, by speeding connections, by eliminating barriers. But friction is the only thing that has ever made privacy, let alone obscurity, possible. If there's no friction, if we can all be profiled instantly and intimately, then there's nothing to stop any of our neighbors from being targeted — nothing, that is, except our priorities.

Today Rosas lives with his daughters in a trailer in Tijuanita a couple of hundred feet from their old apartment. He sleeps on the sofa so the girls can share the only bed. He drives them to the school-bus stop in the morning in his truck. He works as much as he can — to buy them food, to pay for babysitters, to send money to Díaz, who sits jobless and lonely in a village near Puerto Vallarta. When she's in phone range, they call each other on Facebook Messenger — despite the social network's role in her capture — a half-dozen times a day. He tries not to dwell on how to get her back; his lawyer is working on it, he says. He tries not to dwell on it when he sees ICE around. Officer Miller stopped outside his trailer recently, this time in a different unmarked vehicle, American-made and drab-colored, and Rosas nodded at him, and Miller nodded back, and then the two men simply went about their

business. Rosas didn't have time to do otherwise. "Estoy en el barco," he explained recently. "That's a saying we have: I'm on the boat. … I'm on the boat, and I've got to keep going."

Rosas has now spent half his life in the United States, and he still holds an immigrant's faith in his chosen country. But two years ago, as Miller and Dietz drove him to Portland for processing, he couldn't find a way to make sense of a system that purposely targeted someone like him or Díaz, purposely ripping families apart. There was something he couldn't see, and he knew it was more complex than the two men in the front seat. He decided to forgive them for doing their job. Maybe they were just as stuck as he was. "I'm a fisherman," he told them. "You're fishermen, too, for people. I understand you."

McKenzie Funk is working on a book for St. Martin's Press about the history of data. His last article for the magazine was about police body cameras.

A version of this article appears in print on , Page 38 of the Sunday Magazine with the headline: The Watchers